**FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF ROCHESTER,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 95–517 C.

United States Court of Federal Claims.

Oct. 14, 2003.

**140**

David T. Case, Washington, D.C., attorney of record for plaintiff, with whom were Joseph J. Brigati and Joseph P. Vitale.

Jerome A. Madden, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., with whom were Daniel McClain, of counsel; Jeanne E. Davidson, Deputy Director; David M. Cohen, Director, Commercial Litigation Branch; and Stuart E. Schiffer, Deputy Assistant Attorney General, for defendant.

## OPINION

MEROW, Senior Judge.

Pending before the court in this *Winstar*-related case[1] are motions for summary judgment as to the government's liability for breach of specific net worth provisions in a 1986 Financing Agreement signed by the parties. The government asserts the Agreement is not enforceable because it lacks consideration, this action was brought and maintained by other than the real party in interest, and conveyance of rights to any proceeds of this litigation was in contravention of the Assignment of Claims Act, 31 U.S.C. § 3727. For the following reasons, the court grants First Federal's motion for summary judgment on liability and denies the government's cross-motion.

### Factual background

This is a *Winstar*-related dispute arising out of the savings and loan crisis of the 1980's. As chronicled in numerous *Winstar*-related cases, the high interest rate environment in the early 1980's placed the savings and loan industry in the position of funding long-term, fixed-rate loans with short-term, high-cost deposits resulting in net operating losses and reduced capital. The Federal Savings and Loan Insurance Corporation ("FSLIC"), as the insurer of deposits, faced potential calls on the insurance fund and enormous costs should thrifts be taken over or liquidated. The history of the thrift crisis

---

1. *See generally, United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

and government measures to resolve it have been extensively discussed in the original *Winstar* cases. *See United States v. Winstar Corp.*, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964(1996)(*"Winstar IV"*), *aff'g*, 64 F.3d 1531 (Fed.Cir.1995)(*en banc* )(*"Winstar III"*); *Winstar Corp. v. United States*, 25 Cl.Ct. 541 (1992)(*"Winstar II"*)(finding liability for breach of contract); *Winstar Corp. v. United States*, 21 Cl.Ct. 112 (1990)(*"Winstar I"*)(finding implied-in-fact contract).

In order to avoid massive takeovers, FSLIC devised a variety of approaches to "bail-out" the troubled thrifts,[2] one of which was the "Phoenix" program.[3] As recently described by the Federal Circuit, under the Phoenix program, thrifts were merged, consolidated, financially supported and closely monitored by FSLIC.

> The Phoenix program was devised by the federal authorities as an extraordinary measure in their attempts to sustain the savings and loan industry and avert exhaustion of the FSLIC insurance fund. The methodology was to consolidate several failing or failed thrifts into a single association that would not only achieve efficiencies and receive close regulatory oversight, but would also receive significant assistance from the federal government. This assistance included direct monetary contributions, regulatory forbearances, and authorization to use a purchase accounting system whereby assets and liabilities would be revalued at market price and the ensuing net liability would be recorded as an asset called "supervisory goodwill" and accorded an extended amortization term.

> This accounting procedure would permit the new thrift association to absorb the assumed liabilities through annual amortization, while the thrift would recognize accretion income over a shorter period through purchase accounting. As the Court observed in *Winstar*, 518 U.S. at 853, 116 S.Ct. 2432, by this procedure the new thrift could record a profit despite continuing losses, aiding its nominal compliance with regulatory capital requirements until economic circumstances improved. The thrift would also receive direct monetary contributions from the government, in exchange for which the government would receive "income capital certificates," interest-bearing promissory notes that the FSLIC could redeem or forgive in the future. The FHLBB would be authorized to exercise control of the management of the new association, including appointment of its directors and approval of its operations.

*LaSalle Talman Bank v. United States*, 317 F.3d 1363, 1366–67 (Fed.Cir.2003). Phoenix institutions were operated under close supervision with the hope that when a more permanent solution was found, a new institution would arise from the funeral pyre like the mythical Phoenix.

As the first participant in the Phoenix program, commencing in September 1981, First Federal Savings and Loan Association of Rochester ("First Federal"), then a mutual stock association with $1.2 billion in assets, underwent a series of FSLIC approved mergers with four other thrifts, all of which faced serious financial difficulties. On September 3, 1981, First Federal acquired

---

**2.** These new regulatory accounting principles were described in *Winstar IV*:

"Regulatory and statutory accounting gimmicks included permitting thrifts to defer losses from the sale of assets with below market yields; permitting the use of income capital certificates, authorized by Congress, in place of real capital; letting qualifying mutual capital certificates be included as RAP capital; allowing FSLIC members to exclude from liabilities in computing net worth, certain contra-asset accounts, including loans in process, unearned discounts, and deferred fees and credits; and permitting the inclusion of net worth certificates, qualifying subordinated debentures and appraised equity capital as RAP net worth.'

House Report No. 101–54(I), 101st Cong. 1st Sess. 298, U.S.Code Cong. & Admin.News 1989, pp. 86, 94. The result of these practices was that 'by 1984, the difference between RAP and GAAP net worth at S & L's stood at $9 billion,' which meant 'that the industry's capital position, or its cushion to absorb losses was overstated by $9 billion.'" 518 U.S. at 846 n. 2, 116 S.Ct. 2432.

**3.** The phoenix was a mythical bird that upon being consumed in the fire of its funeral pyre arose from the ashes with the freshness of youth. *LaSalle Talman Bank v. U.S.*, 317 F.3d 1363, 1366 n. 2 (Fed.Cir.2003).

Franklin Society Federal with assets of $888 million; on March 8, 1982, First Federal acquired Knickerbocker Federal with assets of $522 million; on March 8, 1982 First Federal acquired Ninth Federal with assets of $422 million; and on September 18, 1982, First Federal acquired First Federal of New York with assets of $649 million. As a result of these mergers, First Federal's books contained over $1 billion in goodwill. Def. Statement of Undisputed Facts, No. 12; Def.App. Ex. 5, p. 2.

Under the Phoenix program, FSLIC provided financial assistance to First Federal by the purchase of Income Capital and Net Worth Certificates ("ICCs" and "NWCs") to fund regulatory accounting practice (RAP) purchase accounting losses. Between 1981 and August 8, 1986, FSLIC provided First Federal with $158.5 million in ICCs and NWCs purchased with FSLIC interest bearing notes. Def. Statement of Undisputed Facts, No. 13; Def.App. Ex. 9, p. 1. These instruments served as substitute capital used to maintain First Federal's regulatory net worth at one percent of assets. FSLIC also appointed a majority, if not all, of the members of First Federal's Board of Directors, installed new management, and exercised substantial control over its operations. Def. Statement of Undisputed Facts, No. 11; Def. App. Ex. 5, p. 1. In October 1984, all outstanding notes (except for notes with a principal value of $9.5 million) were exchanged for cash. Def. Statement of Undisputed Facts, No. 13; Def.App. Ex. 5 at 2–3.

The Phoenix solution was not intended to be permanent. The program allowed regulators to stabilize the financially troubled thrifts until interest rates moderated and a more permanent solution could be arranged. Def. Statement of Undisputed Fact, No. 11; Pl. Statement of Undisputed Facts, No. 3. Despite FSLIC's financial assistance, First Federal's situation deteriorated, such that by April 30, 1986, its liabilities exceeded its assets by $293,264,000. Def.App. Ex. 5 at 3. Because of a continuing obligation to infuse ICCs or NWCs to fill First Federal's capital

hole, which was an ongoing drain on its financial resources, in July of 1986, FSLIC evaluated several alternatives to continuing First Federal in the Phoenix program. Those alternatives were: (1) acquisition of First Federal by a third party with financial assistance from FSLIC; (2) liquidation of First Federal by FSLIC; (3) recapitalization as proposed by First Federal; and (4) a "mini-recapitalization" also proposed by First Federal. Def.App. Ex. 5; Pl. Statement of Undisputed Facts, Nos. 6 & 7.

Subsequently, the parties signed a Financing Agreement on August 8, 1986.[4] Def.App. Ex. 11. Thereunder, FSLIC infused $200 million in cash into First Federal that was credited to net worth and forgave $158 million in ICCs and NWCs payable to FSLIC. First Federal converted from RAP to general accepted accounting principles ("GAAP") accounting, developed a Capital Plan, and agreed (under precise terms which are in dispute) to convert from a mutual to a stock association. FSLIC received certain stock warrants and all Phoenix operating restrictions were lifted. Def.App. Ex. 11; Def. Statement of Undisputed Fact, No. 16.

Significantly, Section 6.10 of the Financing Agreement specified: "[t]he amount of net worth required under 12 C.F.R. § 563.13 or any successor regulation shall not be required of First Federal." As a result, First Federal could continue to operate despite lower capital than required by 12 C.F.R. § 563.13 (1986) or any successor regulation. For the first five years, minimum net worth/total liabilities was 1.09 percent vice the non-preferential minimum net worth ratio of 3 percent. For the sixth and seventh year the minimum ratio was 1.41 percent, and for years eight through 10 the minimum ratio was 3.56.

> Section 6.10. *Net Worth of First Federal.* The amount of net worth required under 12 C.F.R. § 563.13 (1986) or any successor regulation shall not be required of First Federal. Instead, First Federal will be required to have a net worth/total liabilities ratio, computed in accordance

---

4. While the government refers to the Agreement as a "Recapitalization," the court will use the title given the document by the parties.

with generally accepted accounting standards, greater than or equal to the following:

| Years After Initial Closing | Minimum Net Worth/ Total Liabilities |
|---|---|
| 1–5 | 1.09 |
| 6–7 | 1.41 |
| 8–10 | 3.56 |

However, if the net worth ratio should at any time fall materially below the required percentages then First Federal shall be in breach of this Agreement. In addition to any other remedies available, FSLIC shall have all the rights granted it under 12 C.F.R. § 563.13 (1986) or any successor regulation.

Def.App. Ex. 11, p. 57.

On August 8, 1989, three years after the Financing Agreement was signed, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"), was passed. *See generally, Winstar IV,* 518 U.S. at 856–58, 116 S.Ct. 2432. FIRREA abolished the FSLIC and the Federal Home Loan Bank Board ("FHLBB"), replacing them with the Office of Thrift Supervision ("OTS"). It also created a new thrift deposit insurance fund under the Federal Deposit Insurance Corporation ("FDIC"). Of significance in the *Winstar* cases, FIRREA and its implementing regulations required thrifts to maintain core capital reserves totaling no less than 3 percent of assets. FIRREA required the OTS "prescribe and maintain uniformly applicable capital standards for savings associations ... [that] shall be no less stringent than the capital standards applicable to national banks." 12 U.S.C. § 1464(t)(1)(A). Savings and loans that did not meet the minimum capital requirements were required to submit a plan for achieving the new capital requirements that was acceptable to OTS.

On November 15, 1989, in OTS Regulatory Release 89–61 entitled "New Minimum Capital Requirements," First Federal was informed that, based on its Financial Report of June 30, 1989, it would fail one or more of

FIRREA's capital requirements which would become effective on December 7, 1989, and that failure to meet the new minimum standards would result in growth limitations and other restrictions on undercapitalized institutions. "As a result, you must either submit a capital restoration plan ... by the first business day after January 6, 1990, or provide ... sufficient information to demonstrate that you meet the new standards." Pl.App. Ex. 17, Attachment C, p. 2.

On December 18, 1989, the Board of Directors and the Managing Officer of First Federal received correspondence from Angelo A. Vigna, OTS District Director,[5] that referenced Regulatory Release 89–61, and again stated that from available data, the institution did not meet the new capital requirements of FIRREA. If First Federal disagreed, worksheets showing compliance were to be submitted by December 29, 1989. Application could be made for a capital exemption or exception; however, any request had to be accompanied by a Capital Plan pursuant to Thrift Bulletins 36 and 36–1, and be filed no later than January 8, 1990. A Capital Plan had to be "detailed, comprehensive and specific," and demonstrate "full capital compliance at the earliest possible date but no later than 12/31/94." Pl.App. Ex. 41, FR001230; Def. Statement of Undisputed Fact, No. 33. Failure to meet benchmarks in a Capital Plan would subject the institution to "appropriate enforcement action." *Id.,* FR001229.

On January 5, 1990, First Federal submitted its Capital Plan. Def. Statement of Undisputed Fact, No. 35. On January 9, 1990, OTS issued Thrift Bulletin 38–2 informing all savings and loans that previously granted capital and accounting forbearances were eliminated by FIRREA, and that OTS would determine capital adequacy without regard to any such forbearances. Any Capital Plan could not include capital and accounting forbearances eliminated by FIRREA:

A capital plan will not be acceptable if it includes the continuation of previously granted capital and accounting forbear-

---

5. Mr. Vigna was the person primarily responsible for the oversight of First Federal. Pl. State-

ment of Undisputed Facts, No. 5.

ances. Capital plans already submitted that propose to continue previous capital and accounting forbearances will be either disapproved, returned for revision and re-submittal or conditionally approved with the required forbearance denied.

Def.App. Ex. 32.

On May 22, 1990, OTS mailed its "Conditional Approval of Capital Plan" to First Federal's Board of Directors. Def. Statement of Undisputed Facts, No. 37. With some changes, the revised Conditional Approval of the Capital Plan was signed by OTS and First Federal on October 23, 1990. Def. Statement of Undisputed Fact, No. 38.

First Federal contends the government breached the Financing Agreement by imposing on it the more restrictive capital requirements of FIRREA and its implementing regulations. The government asserts the Financing Agreement is not enforceable first, because First Federal did not provide any consideration, and secondly, because First Federal was incapable of contracting as it was an insolvent empty shell, domineered and controlled by FSLIC. The government also alleges that the "real party in interest" is not before the court and that the Assignment of Claims Act, 31 U.S.C. § 3727, was violated. The government also seeks summary judgment on liability and the dismissal of plaintiff's claims for violation of substantive due process and takings. The government's motion to dismiss claims for restitution was withdrawn.

**Summary judgment standards**

Summary judgment is appropriate when there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law. RCFC 56(c). *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). In cases in which both parties move for summary judgment, each party bears the burden of demonstrating the absence of disputes of material facts in its own case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, in order to prevail upon a motion for summary judgment, a party must demonstrate that no disputed facts exist which would change the outcome of the litigation under the governing substantive law.

In the alternative, the government moves to dismiss plaintiff's Complaint on various grounds, invoking Rule 12(b). RCFC 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction; RCFC 12(b)(6) addresses motions to dismiss on substantive grounds. *See generally, AG Route Seven Partnership v. United States*, 57 Fed. Cl. 521, 526–28 (2003). For the purposes of the court's findings herein, any distinction is of no consequence. Pursuant to RCFC 12(b)(4) a complaint may not be dismissed for failure to state a cause of action "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997). The court "must accept the plaintiff's factual allegations in the complaint as true, drawing all inferences in favor of the plaintiff." *Ponder v. United States*, 117 F.3d 549, 552 (Fed.Cir.1997). However, a motion to dismiss for failure to state a claim will be treated as one for summary judgment if matters outside the pleading are presented to and not excluded by the court. Therefore, to the extent that matters outside the pleadings were presented and not excluded by this court, defendant's motion to dismiss shall be treated as a RCFC 56 motion for summary judgment.

**Consideration**

■ The government argues that First Federal was not obliged to do anything under the 1986 Financing Agreement that it was not already required to do under the 1981 Phoenix agreement, and performance of those pre-existing duties was not consideration. It is asserted that the only consideration for the 1986 Financing Agreement was provided by the government which infused additional capital and other assistance into First Federal. According to the govern-

ment, under the 1986 "Recapitalization," the " 'government modified a contract to benefit First Federal but received no additional or different promise or performance in return,' " *citing Aviation Contractor Employees v. United States,* 945 F.2d 1568, 1574 (Fed.Cir.1991). Def. Reply, p. 10. In *Aviation Contractor,* the Federal Circuit applied fundamental contract principles to governmental contracts.

> In Government contracts, lack of consideration most often occurs when the Government modifies a contract to benefit the contractor but receives no additional or different promise or performance in return. Under Restatement, Second, Contracts § 73 (1981), such modifications are without consideration since they involve performance of a pre-existing duty *which is neither doubtful nor the subject of honest dispute.*

*Aviation Contractor,* 945 F.2d at 1574, citing J. Cibinic & R. Nash, *Formation of Government Contracts* 189 (2d ed.1986)(emphasis in original).

First Federal argues the very terms of the Financing Agreement acknowledge its bilateral enforceability, it was the culmination of negotiations between counsel for both parties, the Director of FSLIC who executed the Agreement testified in deposition that it was enforceable, and the government previously admitted the Agreement was a contract.

In determining issues of consideration as well as the other contractual disputes advanced by the parties, the court is mindful of the Supreme Court's admonition in *Winstar* to apply "ordinary principles of contract construction and breach that would be applicable to any contract action between private parties." *Winstar IV,* 518 U.S. at 871, 116 S.Ct. 2432. The requisite contractual elements are no different in *Winstar* cases than in other government contract cases: mutual intent (including an unambiguous offer and acceptance), consideration, and authority on the part of the government representative to bind the government are required. *Anderson v. United States,* 344 F.3d 1343 (Fed.Cir.2003). *See also First Commerce Corp. v. United States,* 335 F.3d 1373, 1379–80 (Fed.Cir.2003); *D & N Bank v. United*

*States,* 331 F.3d 1374, 1378 (Fed.Cir.2003); *Maher v. United States,* 314 F.3d 600, 606 (Fed.Cir.2002); *California Federal Bank v. United States,* 245 F.3d 1342, 1346 (Fed.Cir. 2001), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002).

Applying the foregoing principles to the undisputed material facts in this case, the court concludes the Financing Agreement is neither without consideration nor illusory; accordingly, *Aviation Contractor* is inapposite. For a full understanding of the nature of the consideration rendered, a more detailed examination of the circumstances leading up to the Financing Agreement is necessary.

Despite FSLIC assistance in the Phoenix program, First Federal's capital deteriorated. As a Phoenix institution, First Federal operated with an extremely low capital position with economic losses funded by FSLIC. Pl. Statement of Undisputed Facts, No. 6. A February 10, 1984, Examination Report of First Federal by the FHLBB Office of Examinations and Supervision reported net operating losses of \$85,792,000 in 1982, \$44,192,000 in 1983, and \$6,493,000 million for the quarter ending March 31, 1984. Def. App. Ex. 7, p. 2. Under the Phoenix program FSLIC was obligated to fund capital deficits based on RAP losses rather than actual economic losses which resulted in continuing deterioration of economic net worth. The Report concluded that a restructuring proposal would allow for "a viable institution, free of additional assistance, at a present value cost to the FSLIC substantially below that of the present assistance formula." *Id.* at 2.3. Reviewing options, the Report outlined the economic advantages to FSLIC of recapitalizing as opposed to continuing First Federal in the Phoenix program:

> Under [continuation in the Phoenix program] the present financial assistance arrangement would be extended. This option requires that the FSLIC continue to purchase income capital and net worth certificates from the association to fund regulatory accounting practice (RAP) purchase accounting losses.

The estimated present value cost to the FSLIC of the interest and principal on the

notes issued to the association over a ten year forecast period is approximately $195,000,000. The estimate is based upon several improtant (sic) assumptions which include the association's present management remaining throughout the forecast period and the growth assumptions used in the association's proposed restructuring plan . . . .

However, this alternative is not a resolution strategy for the FSLIC, because it only continues the "Phoenix" status until some future date. Kaplan, Smith & Associates, Inc.'s [6] projections, using the FSLIC's January 1984 market interest rate scenario, demonstrate that the association will not regain positive earnings in a ten year period, even if income capital and net worth certificates continue to be infused in volumes sufficient to maintain regulatory net worth at one percent of total assets.

Def.App. Ex. 7, p. 2.7.

First Federal's 1984 recapitalization proposal anticipated FSLIC assistance to help restore First Federal's ability to access the private capital market. The financial details of the proposed assistance subsequently evolved; however, from the start, eventual conversion to stock form was planned. ("The association will convert to stock form as soon as it has experience [sic] a period of positive actual economic income, and its investment bankers indicate the market is favorable for conversion"). Def.App. Ex. 7, p. 2.4.

In short, under the Phoenix program, FSLIC had a continuing obligation to provide financial assistance through the purchase of ICCs or NWCs—an economic drain on FSLIC and an artificial accounting fiction of indefinite duration—with little hope of repayment. An alternative was to liquidate or otherwise dispose of First Federal at a much higher cost. Def.App. Ex. 9, pp. 1–2.

FSLIC then informed First Federal that it would be the subject of a bidders' conference to be held on August 23, 1984. The Supervisory Agent of the FHLBB of New York mailed letters to thirty potential acquirers; thirteen others were contacted by phone. Eight expressed interest and were invited to the bidders' conference; three others were sent bidders' packages by mail. Despite this activity, First Federal's revised recapitalization package of September 1984 was the only bid received. FSLIC also retained Shearson Lehman/American Express, Inc., to find a buyer, but an active seven month search was not successful. Def.App. Ex. 6, p. 1.

A February 19, 1986, Executive Summary to the FHLBB from Mr. Vigna analyzed First Federal's recapitalization proposal for a $300 million cash infusion and a $500 million non-subsidized loan; or as an alternative, a "mini-recapitialization" of $45 million of assistance in 1986 and 1987 and $124 million in cash. Citing the present value cost of liquidation of $531 million, the Summary recommended recapitalization as a less costly option to FSLIC. Def.App. Ex. 9, p. 2.

As outlined above, the placement of First Federal in the Phoenix program was not a long term solution. In a March 31, 1986, FHLBB Briefing Memorandum Mr. Vigna acknowledged that First Federal's economic situation was deteriorating so maintaining the "status quo" was not a long term solution. Each year from 1982 through 1985 First Federal's net worth deteriorated. Def. App. Ex. 6, pp. 1–7.

As of May 1986, First Federal was a $4.6 billion institution with 73 full service branches throughout the state of New York. By June 3, 1986, FHLBB was drafting a recapitalization agreement. Def.App. Ex. 10. A July 24, 1986 Issue Memorandum to the FHLBB from Thurman C. Connell, FSLIC Acting Director, stated that First Federal's economic position had deteriorated such that on April 30, 1986, interest bearing liabilities exceeded interest earning assets on a book value basis by $293,264,000.[7] Def.App., Ex.

---

6. Kaplan, Smith & Associates, Inc. was engaged by FSLIC on April 23, 1984 to "identify and analyze certain specific options available for resolving the 'Phoenix' status of the association." Def.App. Ex. 7, p. 2.6.

7. A "major factor" cited in First Federal's deteriorating net worth was the 10.45% interest rate paid on government advances made to fund the gap between interest-bearing liabilities and interest earning assets. Without this interest expense, First Federal would have been profitable in 1986.

5, p. 3. The Issue Memorandum concluded that without additional FSLIC assistance it was "highly unlikely" that First Federal would return to profitability. Management was, however cited as being excellent with $1 billion in new business in 1985 primarily in single family mortgages and consumer loans. In sum, the proposal was for FSLIC to infuse $200 million in cash, forgive outstanding ICCs and NWCs, pay a $9.5 million FSLIC note and terminate the Phoenix operating restrictions. In turn, First Federal would immediately convert from RAP to GAAP accounting, eventually convert from mutual to stock form, issue warrants to FSLIC for 25% of future stock, and establish and pursue a Capital Plan. However, because First Federal would "certainly not meet the normal net worth requirements upon recapitalization, and it will require time until [its] future retained earnings and stock offerings contribute enough equity capital for [it] to meet the normal statutory requirements," First Federal would be granted specific minimum net worth requirements for ten years. Def. App. Ex. 5, p. 7.

The Memorandum weighed the pros and cons of options available to FSLIC. Maintaining the status quo, the first option, had the cited advantage of no additional cash outlay; disadvantages included a possible loss of the thrift's management (repeatedly cited in a positive light), and continued deterioration of the institution. The second option was to fund First Federal's economic losses—actual cash losses before regulatory accounting adjustments. While advantages included a relatively low cash outlay and an end to economic deterioration, it was not considered a permanent solution and might result in loss of management. Def.App. Ex. 5, pp. 8–10. The liquidation alternative had the highest costs ($531 million),[8] would require "[m]assive FSLIC staff commitment," would signify the failure of the Phoenix pro-

gram and damage public confidence in the thrift industry in New York. *Id.*, p. 10. The Memorandum recommended the proposed recapitalization plan which was characterized as a long term solution, allowing First Federal to convert to GAAP accounting resulting in a relatively high initial net worth; a cited disadvantage was the $200 million cost. *Id.*

The foregoing analysis and negotiation culminated in the "FSLIC Financing Agreement between First Federal Savings and Loan Association of Rochester and Federal Savings and Loan Insurance Corporation" dated August 8, 1986 under which FSLIC infused $200 million in cash and forgave First Federal from approximately $158.5 million in capital and net worth certificates and outstanding promissory notes. Def.App. Ex. 11. This is the contract that First Federal alleges was breached by FIRREA and its implementing regulations. Complaint, ¶ 1.

For the following reasons the court concludes the 1986 Financing Agreement did not lack consideration. First, the efficaciousness of the Agreement is recited therein: "[i]n consideration of the foregoing premises and the mutual promises contained in this Agreement, the parties agree as follows:" Def.App. Ex. 11, p. 5. The Agreement, signed by the Director of FSLIC, represents that due authorization had been obtained (which the government does not contest), and that FSLIC's performance had been authorized by both FSLIC and the FHLBB:

> Section 4.02.01. *Due Authorization.* The execution, delivery, and performance of this Agreement ... are within the power and authority of FSLIC and have been duly authorized by all necessary action on the part of both FSLIC and the Bank Board.

Def.App. Ex. 11, p. 33.[9]

First Federal's valid existence and the bilateral enforceability of the Agreement are

---

Def.App. Ex. 5, p. 3; Def. App, Ex. 6, p. 7. This interest expense, together with old long-term, low-yielding mortgages, would continue to depress future earnings. In contrast, newly generated business was cited as being profitable. *Id.*

8. The government does not agree that the cost of liquidation cost would have been $531 million. Def. Response to Statement of Undisputed Facts,

No. 9. However, for the purpose of the court's rulings, any factual dispute as to liquidation cost is not material.

9. FHLBB Resolution No. 86–807 of August 7, 1986 authorized the:

> Director or Deputy Director, Office of the FSLIC, Director, Operations and Liquidation

recounted. Section 4.01.01 provides: "First Federal [10] is a Federal savings and loan association duly organized, validly existing, and in good standing under the laws of the United States." Def.App. Ex. 11, p. 23. Section 4.01.03 provides that the "Agreement constitutes a legal, valid, and binding agreement of First Federal." Def.App. Ex. 11, p. 25. Section 4.02.02 recites that the "Agreement constitutes a legal, valid, and binding agreement of FSLIC, enforceable against FSLIC in accordance with its terms." [11] *Id.,* p. 34.

More importantly, several material contractual obligations were imposed on First Federal in the 1986 Financing Agreement providing the requisite consideration. *Cf. Standard Federal v. United States,* 2002 WL 31947572, at *9 (Fed.Cl.2002)(finding the thrift provided no additional or different promise to the government in consideration for a modification of an assistance agreement). First Federal agreed to convert from RAP to GAAP accounting. Def.App. Ex. 5, p. 6; Def.App. Ex. 11, p. 14, Section 1.02; Def. Statement of Uncontroverted Facts, No. 16(3). First Federal granted FSLIC warrants to purchase up to 25 percent of First Federal's stock. Def. Statement of Undisputed Facts, No. 16(7); Def.App. Ex. 11, pp. 20–23. First Federal was obligated to assist FSLIC should FSLIC decide to sell its stock warrants, and agreed to pay the costs and expenses of one secondary stock offering including counsel fees and expenses, and to file and supplement any required registration statement or offering circular, prepare private placement memorandums or similar offering documents, use its best efforts to register or qualify the securities under state securities laws, and take other action related to resale of FSLIC stock warrants. *Id.,* pp. 35–42. First Federal also agreed to indemnify FSLIC from a plethora of claims under

federal and state securities laws. *Id.,* at 43. First Federal made further assurances, including a promise to keep "proper and adequate books of record and account" available for inspection by FSLIC, not change its fiscal year without approval by FSLIC, and provide FSLIC with quarterly and annual consolidated financial statements. *Id.,* pp. 50–51. In a provision subject to controversy described hereinafter, First Federal agreed to use its "best efforts in good faith" to convert from mutual to stock form, report its progress towards conversion, and provide FSLIC with copies of any outside reports on market conditions affecting conversion:

> Section 6.04. *Conversion Covenant.* "First Federal shall use its best efforts in good faith to complete the Common Stock Offering and to consummate the Conversion as soon as practicable, provided that the Board of Directors shall have reasonably determined that it is in the best interests of First Federal to proceed with the Conversion. First Federal shall furnish to the Supervisory Agent a semi-annual report, within 30 days after each June 30 and December 31 commencing December 31, 1986, as to its progress toward making the Common Stock Offering. First Federal shall also furnish to FSLIC and the Supervisory Agent, promptly after receipt thereof by First Federal, copies of all reports it receives from any investment banking firm as to the market conditions affecting the proposed Common Stock Offering and all reports it receives from any appraisal firm as to its valuation of the Common Stock and/or any other securities of First Federal, ..."

*Id.,* p. 88.[12]

So long as FSLIC or its nominee held any warrant, First Federal had a duty to perform

---

Division, or Director, Financial Assistant Division ("Director"), or such person as the Director may designate, to execute on behalf of the FSLIC, an agreement in the form of the Financing Agreement or an agreement in substantially similar form . . . .
Def.App. Ex. 12, p. 2.

10. The Agreement defines First Federal as "First Federal Savings and Loan Association of Rochester, a federal mutual savings and loan association prior to the Conversion and a federal stock

savings and loan association after the Conversion, together with any successor to First Federal." Def.App. Ex. 11, p. 8.

11. Thurman Connell, the FSLIC director who signed the Agreement, testified in deposition that he believed the Agreement was binding. Pl.App. Ex. 11, p. 914:1–8.

12. The court notes a break in the sequence in the page numbering of the Financing Agreement. Def.App. Ex. 11. Page "88 of 102" appears

under a Warrant Agreement (an Exhibit to the Financing Agreement), and furnish FSLIC with copies of notices, statements, and certificates furnished to or received from the Warrant Agent.

> Section 6.05. *Covenants Concerning the Warrant Agreement.* So long as FSLIC or its nominee holds any of the FSLIC Warrants, First Federal (i) shall perform (and shall use its best efforts to see that the Warrant Agent performs) all of its duties and obligations under the Warrant Agreement in a prompt and proper manner, (ii) shall simultaneously furnish to FSLIC copies of all notices, statements, and certificates from time to time furnished to the Warrant Agent pursuant to the terms of the Warrant Agreement, and (iii) shall promptly furnish to FSLIC copies of all notices, statements, and certificates from time to time received from the Warrant Agent pursuant to the terms of the Warrant Agreement.

Def.App. Ex. 11, p. 53.

First Federal also was required to offer FSLIC essentially a right of first refusal on future stock offerings.

> Section 6.06. *Purchase Right.* If First Federal proposes to issue any additional Common Stock or equity or debt securities which are convertible into Common Stock or warrants to purchase Common Stock at any time after the Conversion Closing while FSLIC or its nominee owns any FSLIC Warrants, First Federal shall notify FSLIC in writing of such proposal at least 30 days prior to the issuance of such additional Common Stock, convertible securities or warrants. Such notice shall, where practicable, include a description of (i) all of the material terms of such securities or warrants, (ii) an estimated price range at which and the terms on which such securities or warrants are proposed to be issued by First Federal, and (iii) the estimated minimum and maximum amount of such securities or warrants that First Federal proposes to issue. First Federal shall (A) keep FSLIC apprised of all mate-

rial developments pertaining to such proposal, (B) provide FSLIC with copies of any Offering Documents relating thereto, and (C) provide FSLIC with such other information as FSLIC may reasonably request in connection therewith. FSLIC shall have the right to purchase the number of such securities or of such warrants (at the same time, at the same price, and on the same terms as the other purchasers thereof) that shall be sufficient to permit FSLIC to maintain the same percentage interest in First Federal's pro forma, fully diluted outstanding Common Shares immediately after the issuance of such securities or warrants as FSLIC's percentage interest in First Federal's pro forma, fully diluted outstanding Common Shares immediately prior to the issuance of such securities or warrants. If FSLIC elects to exercise such right, it shall give First Federal written notice of such election within 15 days after receipt of written notice from First Federal of the price at which such securities or warrants shall be sold by First Federal. The right provided for in this subsection shall terminate when FSLIC or its nominee no longer owns any FSLIC Warrants.

*Id.*, p. 54–55.

First Federal also agreed not to take certain action to terminate public trading of its common stock or to restrict the ability of FSLIC to sell its warrants, and covenanted to comply with all statutes, regulations, and orders. *Id.*, pp. 55–56. Any taxes or stamps on the sale of FSLIC warrants would be paid by First Federal. *Id.*, p. 62.

First Federal agreed to "use its best efforts to implement its Capital Plan," Exhibit "E" to the Financing Agreement. Section 6.11, *Id.* p. 57. Following not only the recapitalization provided for in the Financing Agreement ($200 million from FSLIC plus the forgiveness of $158 million in debt), and also $150 million anticipated upon stock conversion, First Federal projected its net worth as follows:

between pages 51 and 53, although the text of the Agreement appears to be cohesive.

| YEARS | ESTIMATED TOTAL ASSETS (IN MILLIONS) | PROJECTED NET WORTH RATIO | STATUTORY CAPITAL REQUIREMENT |
|---|---|---|---|
| 1988 | 5,108 | 4.4% | 4.0% |
| 1989 | 5,274 | 4.9% | 4.5% |
| 1990 | 5,456 | 5.5% | 5.0% |
| 1991 | 5,649 | 6.2% | 5.5% |
| 1992 | 5,853 | 7.0% | 6.0% |

Def.App. Ex. 11, Attachment E, FR0070125. First Federal agreed to "commence the process of preparing to access the public markets ... with the goal of completing the entire conversion and stock issuance process within an 18–36 month period from recapitalization." *Id.*, FR0070124; Def. Statement of Undisputed Facts, No. 21. Finally, "[r]egardless of market conditions the Association will take all steps available to reach compliance with currently projected statutory capital requirements as soon as possible." Def. App. Ex. 11, Attachment E, FR0070125–26; Def. Statement of Undisputed Facts, No. 22.

In another provision, perhaps unique to this *Winstar* case, both FSLIC and First Federal agreed to pay the prevailing party's attorneys' fees and costs.

> Section 8.10. *Litigation Costs.* If any legal action or any arbitration or other proceeding of any kind is brought for the enforcement of this Agreement, the Warrant Agreement, or any FSLIC Warrant, or because of an alleged breach, default, or misrepresentation or any other dispute in connection with any provision or provisions of this Agreement, the Warrant Agreement, or any FSLIC Warrant, the successful or prevailing party or parties shall be entitled to recover all reasonable attorneys' fees and other costs incurred in such action or proceeding, in addition to any other relief to which it or they may be entitled.

Def.App. Ex. 11, p. 61.

The government argues that the right to receive stock warrants was not consideration because it "was merely the exchange of one form of ownership interest for another." Def. Motion,[13] p. 31, n. 17. Plaintiff counters that the government did not have an ownership interest in First Federal; accordingly, the granting of stock warrants conferred a benefit (consideration) on the government. Although even without the granting of stock warrants, there is ample consideration, the court rejects the government's argument. At the time of the 1986 Financing Agreement, First Federal was a mutual association operated for the benefit of its depositors. *Dougherty v. Carver Federal Sav. Bank,* 112 F.3d 613, 615 (2nd Cir.1997); 12 C.F.R. § 544.1 (1986)(charters of federal mutual savings and loan association provide that "[a]ll holders of the association's savings, demand, or other authorized accounts are members of the association ..." with one vote for each $100 on deposit).[14] Indeed, in another part of its Motion, the government acknowledges that First Federal was a mutual association in 1986, owned by its depositors. Def. Motion, p. 54. The government does not contend FSLIC was a depositor; nor does the government contend that the ICCs and NWCs granted FSLIC an equity ownership in the mutual association; thus, there was no pre-existing ownership interest to be "exchanged" for the stock warrants. Accordingly, granting FSLIC the right to acquire future stock ownership was consideration.

Admittedly, the government subsequently demanded and received $3 million for the release of the warrants when First Federal converted to a stock association.[15] Pl.App.

---

**13.** While the government's motion is titled "Supplemental," it is not.

**14.** In the event of an involuntary liquidation or dissolution, the value of any remaining assets would have been distributed to the depositors. 12 C.F.R. § 544.1, Federal Mutual Charter, § 8.

**15.** Even if the 1986 Financing Agreement recited that ICCs and NWCs were "exchanged" for stock

warrants which the government asserts, as the latter were valued at $3 million, and the former $158 million, any "exchange" was not even. Moreover, consideration is a bargained-for exchange. *See NSK Ltd. v. United States,* 115 F.3d 965, 975 (Fed.Cir.1997), citing *3 Williston on Contracts,* § 7:2 at 18–19 (4th ed.1992); *2 Corbin on Contracts,* § 5.1 at 6 (Rev. ed.1995); *Restatement (Second) of Contracts,* § 71 (1979).

Ex. 10, p. 3, ¶ 6; Pl. Statement of Undisputed Facts, No. 24; Def.App. Ex. 71, p. 105, Section 9.8. Having received significant benefit from the Financing Agreement, FSLIC is estopped and may not now contend the Agreement is not binding because of lack of consideration.

The court further concludes that First Federal was a viable, albeit insolvent thrift when it entered into the Financing Agreement, and rejects the government's argument that First Federal was incompetent to contract because of its financial condition. In *LaSalle Talman Bank v. United States,* 45 Fed.Cl. 64, 118 (1999), *aff'd in part, vacated in part on other grounds,* 317 F.3d 1363 (Fed.Cir.2003), the court rejected the government's claim that the thrift—a Phoenix participant approaching negative book value— was " 'effectively dead' " and could not have incurred liabilities (i.e., consideration) because " 'cadavers cannot assume liabilities.' " In affirming the court's finding that the government breached its contractual obligations with LaSalle, the Federal Circuit did not pause over the thrift's Phoenix status. 317 F.3d at 1369–70 (Fed.Cir.2003). Indeed, a concept that insolvent thrifts are incapable of contracting would be contrary to the wealth of *Winstar* liability decisions, as many if not most involved an insolvent thrift. First Federal's capital woes did not defeat its ability to contract.

The government also relies on FSLIC's right to choose and control First Federal's board of directors, to undertake a merger or conversion at FSLIC's discretion, and cites to a right to dictate First Federal's day-to-day operations. Def. Supp. Brief at 3. The same argument was rejected in *LaSalle Talman,* 45 Fed.Cl. at 67–8, where the court noted that FSLIC replaced the majority of the directors, subjected Talman to various operating restrictions, and required it to replace its Chief Operating Officer. Furthermore, while the 1981 Purchase Agreement, signed by both FSLIC and First Federal, granted FSLIC significant control over the Phoenix First Federal, the covenants therein document the thrift's separate and independent existence. Def. Supp. Brief, Ex. 2. The Board of Directors of the Phoenix First Fed-

eral had six members, two of whom previously served on the Board of either First Federal or Franklin Society, a thrift acquired by merger. *Id.,* Recital, ¶¶ 1, 3. The Agreement was binding on First Federal, recited as a validly existing mutual savings and loan association. *Id.,* p. 3, Section 2.2. The Purchase Agreement contains the conditions under which FSLIC was obliged to purchase ICCs under a Master Agreement. For the first purchase FSLIC delivered to First Federal a $42 million five year promissory note and First Federal delivered to FSLIC ICC's in that amount. *Id.,* p. 8, Section 4. "The purchase and sale of Income Capital Certificates on any subsequent Purchase Date shall be made in such amounts and manner as may be mutually agreed upon by the parties." *Id.* First Federal was required to submit operating plans every six months, quarterly projected operating budgets, statements of condition and cash flow forecasts, end-of-quarter actual operating reports, monthly statements of income and expense, and other reports as requested by FSLIC. *Id.,* Section 5.1. Written approval was required if operating expenses in any three month period would exceed projections, or there was a material increase in borrowing. *Id.,* p. 9, Sections 5.2 & 5.3. FSLIC would be notified of the commencement of any litigation with damage requests in excess of $500,000. *Id.,* p. 13, Section 5.18. These provisions, while granting close supervision, attest to the bona fides of the Phoenix First Federal and its ability to contract.

On September 30, 2002, the court invited the parties to submit supplemental briefs of any relevant subsequent precedent. The government's Supplemental Brief filed October 10, 2002, attaches an expert report of Professor Haluk Unal. The government cites Dr. Unal's report as support for its position that (1) in 1986, as a Phoenix institution, First Federal was a *de facto* nationalized thrift already owned by (or a "ward") of FSLIC, thus incapable of either giving consideration or contracting; and (2) elementary principles of corporate economics counsel that the government, the only economic stakeholder at the time of the breach, should not be liable for damages related to precluding the corporation from taking additional

risk (i.e., merging with Monroe). Def. Supp. Brief at pp. 5 and 6, n. 6. Dr. Unal also opines that no party other than FSLIC made any explicit or implicit or equity or monetary contribution as part of the 1986 Financing Agreement, and no other entity shouldered any of the government's burden to shore up insured deposits. Def. Supp. Brief, Ex. 3, p. 11. With all due respect to Dr. Unal, the court has already rejected the former argument and found that First Federal was capable of contracting. Furthermore, also recited above, while FSLIC exercised considerable control over the Phoenix First Federal, the thrift remained viable and capable of providing the consideration recited and provided for in the 1986 Financing Agreement. As for Dr. Unal's other cited conclusions, while it appears that no entity other than FSLIC infused funds into First Federal as part of the 1986 Financing Agreement, and no entity other than FSLIC bore the risk of insured depositors, that does not end the inquiry. First Federal's promises recited above provide the necessary consideration.

**Real party in interest**

The government also contends that, while First Federal was a party to the 1986 Financing Agreement, through subsequent stock conversions, mergers and sales of its stock, First Federal no longer exists. First Federal, the mutual association that signed the Agreement, ceased to exist following its conversion to stock form on March 22, 1991. Secondly, even if First Federal, the 1986 contracting entity, survived the conversion to stock form, that entity ceased to exist when its stock was sold subsequent to the filing of this lawsuit. As a result, according to the government, First Federal is not the real party in interest under RCFC 17(a), and under RCFC 25(c) its successor in interest must be substituted as party plaintiff. The government also argues that the creation of preferred stock that holds the right to any proceeds from this litigation (discussed hereinafter) violated the Assignment of Claims Act, 31 U.S.C. § 3727(b). The government is incorrect on both points. First Federal, the party that signed the 1986 Financing Agreement, remained intact as an entity regardless of its change in form from a mutual associa-

tion, owned by its depositors, to a stock association, owned by its shareholders. That corporate entity continued through subsequent reorganizations and stock sales. Furthermore, the spinoff of the right to proceeds of this litigation along with the right to control as well as the obligation to fund the same to a class of shareholders, was not contrary to the Assignment of Claims Act.

The Federal Circuit has held consistently that "'the government consents to be sued only by those with whom it has privity of contract.'" *Anderson v. United States,* 344 F.3d 1343, 1351 (Fed.Cir.2003)(quoting *Erickson Air Crane Co. of Wash. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984)); *Maher v. United States,* 314 F.3d 600, 603 (Fed.Cir.2002), *cert. denied,* —— U.S. ——, 124 S.Ct. 133, 157 L.Ed.2d 40, 2003 WL 21383004 (Oct.6, 2003)(No. 02–1783)(same); *W.G. Yates & Sons Constr. Co. v. Caldera,* 192 F.3d 987, 991 (Fed.Cir.1999) ("[G]overnment has not consented to be sued by those with whom it is not in privity").

RCFC 17(a), "Real Party in Interest," which is identical to Rule 17(a) of the Federal Rules of Civil Procedure, states: "[e]very action shall be prosecuted in the name of the real party in interest." The rule applies to transfers prior to the initiation of litigation. *Standard Federal v. United States,* 51 Fed. Cl. 695, 707 (Fed.Cl.2002). As the court noted, "[t]he 'real party in interest' is the party who, by substantive law possesses the right sought to be enforced and not necessarily the person who will ultimately benefit from the recovery." *Id.,* citing *United States v. 936.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir.1969). Even if litigation is commenced by other than a "real party in interest," however, dismissal is not appropriate until a reasonable time following an objection on that basis for "ratification of commencement of the action by, or joinder or substitution of, the real party in interest ...." RCFC 17(a).

The various corporate and stock transactions are described by the parties. *See generally,* Def. Statement of Undisputed Fact, Nos. 39–57 and Pl. Statement of Genuine Issues in Response. While complex, for the

court's purposes, only those cited corporate transactions subsequent to First Federal's conversion from a mutual association to a stock association are material. Except as cited below, sales of stock or creation of classes of stock are not directly germane to the issues currently before the court. This action was commenced by the real party in interest and, despite the subsequent corporate evolution, the real party in interest remains.

**Stock conversion and sale**

 First Federal, the mutual association, entered into the 1986 Financing Agreement. In the fall of 1988, Canada Trust ("CT") sought out and initiated discussions of a business alliance with First Federal as CT desired to enter the northern United States financial market. Def. Statement of Undisputed Facts, No. 39. Although First Federal asserts it did so under protest and only because of the government's alleged breach of the 1986 Financing Agreement, First Federal agreed that CT Financial Services, Inc. would acquire 85 percent of the newly created First Federal stock with the remaining 15 percent offered to First Federal's depositors. The Plan was approved by First Federal's Board of Directors on September 27, 1990. Def. Statement of Undisputed Facts, No. 42; Def.App. Ex. 51. Although the parties differ on the reasons why, no depositor offering was made.[16] The agreement was renegotiated, and on April 19, 1991, OTS approved the transaction. CTUS, Inc., a Delaware corporation and wholly-owned subsidiary of CT Financial Services, Inc., a Canadian corporation, acquired 100 percent of First Federal's stock for $188 million. Def. Statement of Undisputed Fact, Nos. 43–47 and Pl. Response; Def.App. Exhs. 50, 71; Pl.Ex. 10, Attachment.

First Federal's May, 1991 Plan of Conversion provided for institutional continuity. All property of the mutual association, including causes of action, vested in the stock association.

The Conversion shall not cause the legal existence of the Association to terminate, but the Converted Savings and Loan Association shall be a continuation of the entity of the Association and **all property of the Association, including** its rights, title and interest in and to all property of whatever kind and nature, whether real, personal, or mixed and things and **choses in action** ... **shall vest in the Converted Savings and Loan Association.**

Pl.App., Ex. 10, attachment, p. 8, ¶ 11, emphasis supplied.

As previously noted, the 1986 Financing Agreement also specified it would be binding on First Federal when it converted to a stock association. "First Federal" was defined as:

... First Federal Savings and Loan Association of Rochester, a federal mutual savings and loan association prior to the Conversion and a federal stock savings and loan association after the Conversion, together with any successor to First Federal.

Def.App. Ex. 11, p. 8.

Furthermore, regulatory provisions provide for continuity following conversion:

The corporate existence of a mutual association converting to a federally-chartered stock association shall not terminate, but the converted association shall be deemed to be a continuation of the association so converted. In the case of a Federal or a State-chartered mutual savings association converting to a State-chartered stock savings association, unless State law otherwise prescribes, the corporate existence of the converting savings association shall similarly not terminate and the converted savings association shall be deemed to be a continuation of the savings association so converted.

12 C.F.R. § 563b.8(d)(3)(1991); Pl.App. Ex. 25. First Federal did not cease to exist. Its ownership structure merely changed. *See also Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 886 F.Supp. 658, 671

---

**16.** Whether a determination was made that a depositor offering was not required, would not be successful or would complicate and delay the offering, is not material to either the court's

findings or conclusions. For whatever reason, no offering was made to the depositors and the stock conversion agreement was renegotiated.

(N.D.Ind.1995)(conversion did not extinguish thrift's claim).

First Federal's ownership structure merely changed from a mutual to a stock association without loss of the substantive rights granted to First Federal under the 1986 Financing Agreement. First Federal had not assigned any claims for breach of the Financing Agreement in 1995 when it filed this action, First Federal was and remains the proper party. Accordingly, the First Federal stock association that filed its Complaint on August 7, 1995 is the same entity that entered the 1986 Financing Agreement. The Complaint was filed by the "real" party in interest.[17]

### Post–Complaint merger

■ The government's next argument is that, even if First Federal, the contracting entity and its claims under the 1986 Financing Agreement survived conversion from a mutual to a stock association in May of 1991, that entity and contract rights did not subsequently transfer through CT Financial Services, Inc.'s August 21, 1996 sale of its stock in CTUS, Inc. (First Federal's parent company) to HBSC Americas Inc. ("HBSC") for $712 Million. Def.App. Ex. 53. On January 9, 1987, subsequent to the filing of this lawsuit, First Federal was merged with and into HSBC's subsidiary, then known as Marine Midland Bank ("Marine Midland"), a commercial bank chartered in the State of New York.[18] Pl.App. Ex. 38. Regardless of the complexity of the shareholders' chain of title or the acquisition of shareholders' parent companies, any stock sale or reorganization of parent companies did not eliminate or destroy the continuity of First Federal, the underlying corporate entity. By agreement and operation of law, First Federal's substantive cause of action for breach of contract flowed through the merger to Marine Midland, the surviving corporation.

Under the Bank Plan of Merger between Marine Midland and First Federal dated January 9, 1997, Marine Midland, acquired all "property, rights, powers, duties and obligations," of First Federal including:

> ... any claim, right, benefit or administrative or judicial proceeding comprising, arising out of, or resulting from that litigation filed by First Federal in the United States Court of Federal Claims styled *First Federal Savings and Loan Association of Rochester v. United States,* No. 95–S17C (sic)(Fed.Cl. filed Aug. 7, 1995).

*Id.,* p. 2, ¶ 1.2(b).

The Merger Agreement provides it is governed by New York law. *Id.,* p. 5 ¶ 4.7. Under New York law, Marine Midland is considered a continuation of First Federal and, by operation of law, any pending litigation continues as if the merger had not occurred.

> At the time when a merger becomes effective:
>
> (1) the receiving corporation shall be considered the same business and corporate entity as each corporation merged into it;
>
> (2) all the property, rights, powers and franchises of any corporation that shall be so merged shall vest in the receiving corporation and the receiving corporation shall be subject to and be deemed to have assumed all of the debts, liabilities, obligations and duties of such merged corporation and to have succeeded to all of its relationships, fiduciary or otherwise, as fully and to the same extent as if such property, rights, powers, franchises, debts, liabilities, obligations, duties and relationships had been originally acquired, in-

---

17. The government's supportive citations for its argument that this action was not brought by the real party in interest are distinguishable. *Computer Prods. Intl., Inc. v. United States,* 26 Cl.Ct. 518, 528 (1992)(neither President nor shareholder have standing to sue government for breach of corporate contract); *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 695, 1980 WL 13154 (1980)(generally shareholders and employees lack standing to assert corporate claim); *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428

F.2d 1241 (1970)(stockholder had no standing with respect to contracts to which only corporate contractor and government were parties); *Kane v. United States,* 26 Cl.Ct. 655, 660 (1992)(one not in contractual privity is not real party in interest).

18. The State of New York Banking Department approved the merger effective as of March 1, 1997. Pl.App. Ex. 19, Attachment.

curred or entered into by the receiving corporation;

(3) any reference to a merged corporation in any contract, will or document, whether executed or taking effect before or after the merger, shall be considered a reference to the receiving corporation if not inconsistent with the other provisions of the contract, will or document;

(4) a pending action or other judicial proceeding to which any corporation that shall be so merged is a party, shall not be deemed to have abated or to have discontinued by reason of the merger, but may be prosecuted to final judgment, order or decree in the same manner as if the merger had not been made; or the receiving corporation may be substituted as a party to such action or proceeding, and any judgment, order or decree may be rendered for or against it that might have been rendered for or against such other corporation if the merger had not occurred.

N.Y. Banking Law § 602 (McKinney 1996); Pl.App. Ex. 37. pp. 1–2.

Possible assignment was also contemplated in the 1986 Financing Agreement which provides it is binding on successors and assigns.

Section 8.06. *Benefit and Assignment.* This Agreement shall be binding upon and shall inure to the benefit of First Federal and FSLIC and, except as otherwise provided in this Agreement, their respective successors and assigns, provided that, except as otherwise expressly provided in this Agreement, First Federal may not assign or transfer any of its rights, privileges, or powers or delegate any of its duties or obligations under this Agreement without the prior written consent of FSLIC.

Def.App. Ex. 11, pp. 60–61.

The government's argument on which it bases its assertion that First Federal ceased to exist following its merger into Marine Midland, has been considered and rejected in several *Winstar cases.* In *Fifth Third v. United States,* 55 Fed.Cl. 372 (2003), Citizens, the contracting entity, merged into that plaintiff. In concluding that any contractual privity flowed through the merger, the court stated: "[a]fter plaintiff acquired Citizens, it obtained the rights and privileges possessed by Citizens, including the right to stand in privity of contract with the Government." 55 Fed.Cl. at 377 citing *FDIC v. United States,* 51 Fed.Cl. 265, 271 (2001) (citing *Glendale Fed. Bank F.S.B. v. United States,* 239 F.3d 1374, 1378 (Fed.Cir.2001)). In *Standard Federa.,* Heritage, the contracting party, merged with Standard Federal. Analyzing federal statutes and regulations governing mergers of federal savings associations and applying general corporate law, the court held that Heritage's pending claim for breach of contract flowed through the merger to Standard Federal, the surviving corporation. 51 Fed.Cl. at 708.

■ In its Reply, the government characterizes the consequences of these transfers is that First Federal is not the real party in interest because First Federal's charter was automatically revoked under 12 C.F.R. Section 552.13(k) and (*l*)(1996) when it merged into Marine Midland. As a result, substitution of Marine Midland, the assignee was required under RCFC 25, but since more than five years have passed since the sale and merger, it is too late to substitute, therefore dismissal is warranted. The court does not agree. Regulatory cancellation of First Federal's charter does not denigrate the pass-through of assets and liabilities including claims per the agreement of the parties or governing state law. Moreover, First Federal did not admit in its Opposition that Marine Midland, as the surviving entity was the proper party to pursue the breach of contract claim as the government argues. The language cited by the government ("where a corporate entity with a claim against the government undergoes a merger or reorganization, the successor by operation of law is the proper party to pursue the claim ... ") was taken out of context. First Federal's statement was made to refute the argument discussed hereinafter that a spinoff of an interest in the proceeds of any judgment First Federal may receive in this litigation, was not an assignment of the "claim," but a financial arrangement between two private parties, not a violation of the Assignment of Claims Act. Even if the quote was an admission, the court is of course not bound;

rather the court has discretion to substitute or join Marine Midland, the party to whom the assets including this breach of contract claim were transferred.

RCFC 25 provides in relevant part:

(c) Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

RCFC 25(c), like its federal counterpart, is applicable to transfers following the initiation of litigation and allows the action to continue with the original party unless the court orders otherwise. *Standard Federal,* 51 Fed. Cl. at 707, citing *Horphag Research Ltd. v. Consac Indus., Inc.,* 116 F.3d 1450, 1453 (Fed.Cir.1997)(Rule 25(c) applies to pending litigation). Litigation may continue with the original filing corporate party even if that party merged with another corporation.

Rule 25(c) "does not require that anything be done after an interest has been transferred." When a defendant corporation has merged with another corporation, for example, the case may be continued against the original defendant and the judgment will be binding on the successor even if the successor is not named in the lawsuit. . . .

Because joinder or substitution under Rule 25(c) does not ordinarily alter the substantive rights of parties, but is merely a procedural device designed to facilitate the conduct of a case, a Rule 25(c) decision is generally within the [trial] court's discretion.

*Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.,* 13 F.3d 69, 71–72 (3rd Cir.1993). *See also Standard Federal,* 51 Fed.Cl. at 707; *Franklin Federal Savings,* 53 Fed.Cl. at 722 n. 9.

In the Rule 25(c) context, corporate mergers or acquisitions are "transfers of interest." *Standard Federal,* 51 Fed.Cl. at 708, *citing Luxliner P.L. Export, Co.* An order of joinder is merely a discretionary determination by the trial court that the transferee's presence would facilitate the conduct of the litiga-tion. *See Finast Metal Products, Inc. v. United States,* 12 Cl.Ct. 759, 760 (1987), citing *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.,* 757 F.2d 1256, 1264 (Fed.Cir. 1985). *See also* 7C Wright, Miller & Kane, Federal Practice & Procedure § 1958 at 555–57 (1986).

The First Federal that filed this action on August 7, 1995 was (and is) a continuation of the same entity that signed the Financing Agreement in 1986. The Complaint was in-stituted by the real party in interest, "the party who, by substantive law, possesses the right sought to be enforced." *Standard Federal,* 51 Fed.Cl. 695 at 707. This pending claim passed by agreement and operation of law when First Federal merged into Marine Midland. As plaintiff points out, First Federal "ceased to exit" by virtue of the merger only in the sense that two entities combined. Joinder or substitution of Marine Midland is not necessary to facilitate the conduct of this litigation, particularly because many if not most of the percipient events occurred years prior to its acquisition. The court concludes that neither joinder nor substitution is re-quired. 7C *Wright, Miller & Kane,* § 1958 at 557; 6 *James Wm. Moore et al., Moores' Federal Practice* ¶¶ 25.30–25.34.

## Assignment of Claims Act

■ The Assignment of Claims Act pro-vides, in relevant part, as follows:

(a) In this section, "assignment" means—

(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or

(2) the authorization to receive pay-ment for any part of the claim.

(b) An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for pay-ment of the claim has been issued.

31 U.S.C. § 3727(a) & (b).

The government asserts that the post-complaint assignment of the right to any proceeds from this lawsuit (as well as the ob-ligation to fund and right to direct this litiga-tion) violated the Act because it was made before any "claim" was allowed. The court

does not agree. While First Federal (or any of its successors) may not assign its substantive claim for breach, the assignment of any proceeds is not an assignment of the claim and is not prohibited as between the private parties. *3 Moore's Federal Practice* § 17.11[2][a]. and n. 20. As the court has found, the cause of action was transferred through and survived the various corporate mergers and restructuring. The right to any proceeds of this litigation, a separate issue, followed a different, but no less valid path.

Immediately prior to HSBC's purchase of First Federal's stock from CT Financial Services, Inc. on August 21, 1996, CTUS created two classes of stock: (1) common stock that was conveyed to HSBC, and (2) preferred stock that retained beneficial interest in any recovery in this action (denoted as the "FIRREA preferred tracking shares" that held the "interest, the net value of the results of the FIRREA claim"). Def.App. Ex. 62 at 26; Def. Reply, pp. 35–36. Following a series of interrelated conveyances, those shares are owned by FIRREA, Inc., a wholly owned subsidiary of CT. Subsequent to the sale of the common stock of First Federal to HSBC, First Federal was merged into Marine Midland. *Id.*

The government claims the transfer provisions of First Federal's merger with Marine Midland, which the court reviewed above, are irrelevant, because the merger occurred after FIRREA tracking shares had been created and transferred to FIRREA, Inc. As a result, First Federal did not own any FIRREA claim to be transferred to Marine Midland according to the government. For this point, both parties rely on deposition testimony of Alan E. Wheable, a lawyer for Toronto Dominion Bank and its subsidiaries, including CT. Def.App. Ex. 62. While the transaction chain is complex, what is important for the court's immediate purpose is the evidence cited by the government for the undisputed fact that the FIRREA tracking preferred shares embodied First Federal's breach of contract "claim," specifically, the deposition testimony of Mr. Wheable. Mr. Wheable testified that the stock held "the net value of the results of the FIRREA claim." Def.App. Ex. 62, p. 26, lines 11–19 (emphasis supplied and not included in the government's quotation of this testimony).[19] Conveyance of any right to proceeds of litigation is not an assignment of the underlying substantive claim.

■ Arrangements between non-governmental parties concerning payment of litigation costs and distribution of any recovery is a private matter between the parties, not a contravention of Assignment of Claims Act. There is a difference between continuity of First Federal's cause of action for breach and a private contractual right to proceeds of any recovery. In *Dorr–Oliver, Inc. v. United States,* 193 Ct.Cl. 187, 432 F.2d 447 (1970), the Court of Claims held that the plaintiff's agreement to pay a third party 10% of plaintiff's recovery against the United States did " not violate the anti-assignment statute" because the " agreement simply creates contract rights between plaintiff and [the third party] and does not give [the third party] a lien on any recovery against the United States." 193 Ct.Cl. at 196–97, 432 F.2d at 452. That is precisely the situation in the case at bar. While complex in chain of title, what was transferred, spunoff, or retained or transferred to the various entities was neither a lien on any recovery nor an independent right of action against the United States. The assignee has no claim against the government. The assignments were of

---

19. The government describes the conveyances that occurred hours before the Marine Midland merger:

"The preferred stock (referred to as the tracking FIRREA shares in the deposition) was then transferred to FIRREA, Inc. a wholly owned subsidiary of Canada Trust. The common stock was then transferred to HSBC. Then FIRREA, Inc. transferred the FIRREA tracking preferred shares to HSBC in exchange for HSBC transferring FIRREA tracking preferred stock that it had issued back to FIRREA, Inc.

Subsequent to the sale of the common stock of First Federal to HSBC First Federal was merged into Marine Midland. Finally, Canada Trust: (1) owns a(sic) 100 percent of FIRREA, Inc. (the holder of the FIRREA preferred tracking stock); (2) controls the prosecution of this action: (3) funds the attorneys and experts assigned to work on it; and (4) is the party that will receive any recovery that may be awarded."

Def. Reply, p. 36, citations to the record omitted.

the right to proceeds—a contractual arrangement between private parties.

Specifically, in *Franklin Federal Sav. v. United States,* 53 Fed.Cl. 690, 720 (2002), a *Winstar* case, the original shareholders transferred their right to proceeds of the litigation, some settlement authority and 50% of their obligation to fund the litigation. The court, applying *Dorr–Oliver, Inc., supra.* noted that such assignment created contract rights between the shareholders and the assignee but did not create any lien on any recovery against the government. In *Standard Federal,* as in *Franklin Federal,* the plaintiff was sold after the Complaint was filed. The buyer and seller agreed that the seller was responsible for the cost of litigation and would be entitled to any proceeds of the claim. 51 Fed.Cl. at 699–700. The government argued this contravened the Assignment of Claims Act. The court disagreed, explaining that "[a]n assignment of the proceeds of a claim, however, is not an assignment of the claim itself." *Id.* at 710, quoting from *Standard Federal Bank v. United States,* 51 Fed.Cl. 695, 710 (2002). *See also Twin City Shipyard, Inc. v. United States,* 21 Cl.Ct. 582, 588 (1990) (citations omitted) ("a valid assignment of contract proceeds, standing alone, does not create privity of contract between the assignee and the United States"); *Produce Factors Corp. v. United States,* 199 Ct.Cl. 572, 581, 467 F.2d 1343, 1348 (1972) ("Terminal's assignment to plaintiff of the right to contract proceeds could not, and did not, create any contractual relationship whatsoever between plaintiff and the United States").

Moreover, the various mergers and transformation of ownership of First Federal do not implicate the Assignment of Claims Act because "[t]ransfers or assignments occurring by operation of law are exempt from the Act's application." *Johnson Controls World Services, Inc. v. United States,* 44 Fed.Cl. 334, 343 (1999). *See also Patterson v. United States,* 173 Ct.Cl. 819, 823–24, 354 F.2d 327, 329–30 (1965). As the court explained in *Johnson Controls,* "[t]ransfers by operation of law include corporate mergers, consolidations, and reorganizations." *Id.* at 343 (emphasis added). *See also Tuftco Corp. v.*

*United States,* 222 Ct.Cl. 277, 614 F.2d 740, 745 (1980) ("Perhaps the most significant exception to the [Assignment of Claims Act] is when transfer of a claim . . . . is effected by consolidation or merger to the successor of a claimant corporation").

Nor does the assignment of proceeds violate the public policy underlying the Assignment of Claims Act. That policy, as set forth by this court's predecessor in *Kingsbury v. United States,* 215 Ct.Cl. 136, 563 F.2d 1019 (1977), is threefold:

> . . . first, to prevent persons of influence from buying up claims which might then be improperly urged upon Government officials; second, to prevent possible multiple payment of claims and avoid the necessity of investigation of alleged assignments by permitting the government to deal only with the original claimant; and third, to preserve for the Government defenses and counterclaims which might not be available against an assignee.

563 F.2d at 1024. Here, the government does not allege that a "person of influence" has purchased claims or a lien against the government has been granted, nor has the government asserted that any defenses or counterclaims are imperiled. There is no danger of a multiple payment of claims because FIRREA, Inc. is neither a party to this action nor has asserted any claim against the government. *Cf. Westfed Holdings, Inc. v. United States,* 52 Fed.Cl. 135, 142–44 (2002)(Assignment of Claims Act violated and partial assignment voided when following commencement of litigation, the thrift's holding company partially assigned its claim to an individual then made a party to the action).

Even if any of the foregoing violated the Act, recourse is not elimination of the claim. The Anti–Assignment Act does not invalidate a claim that is assigned outside its parameters; it treats the claim as though it had not been assigned, looking to the assignor (First Federal or its successor) not the assignee (CT) to pursue it. *See Wall Indus., Inc. v. United States,* 15 Cl.Ct. 796, 803 (1988), *aff'd,* 883 F.2d 1027 (Fed.Cir.1989); *7A, Fed. Proc., L.Ed.* § 19:150. First Federal and/or its cor-

porate successors continually possessed the original claim.

**Breach**

■ First Federal filed its Complaint on August 7, 1995. Pursuant to the September 18, 1996 Omnibus Case Management Order in *Winstar* related cases, First Federal filed its Short Form Motion for Partial Summary Judgment on Liability on February 28, 1997. Pl.App. Ex. 1. The sole issue in that motion was whether the government was liable for breach of the net worth/total liabilities ratio provisions of Section 6.10 of the 1986 Financing Agreement.[20] That motion asserted that the August 8, 1986 Financing Agreement was binding on the government and was breached by passage of FIRREA and its implementing regulations which imposed more restrictive capital requirements. Under the Case Management Order ("CMO"), the government was required to address only two issues: (i) whether a contract existed; and (ii) whether the government acted inconsistently with that contract. CMO, ¶ 5 a-b. The government admitted in its Sixty Day Response that, assuming First Federal maintained the minimum net worth ratios of Section 6.10 which the government characterized as conditions precedent to its contractual obligation, then the 1986 Agreement was a contract between First Federal, and Section 6.10 granted "First Federal a forbearance from compliance with net worth ratios required by 12 C.F.R. § 563.13 (1986), or any successor regulation," and "by enacting the Financial Institutions Reform, Recovery, and Enforcement Act ('FIRREA'), the Government had acted inconsistently with that contract." [21] Pl.App. Ex. 4, p. 3. The government also reserved the right to identify any additional defenses relevant to these issues at a later date pursuant to the CMO. In its 120 Day Response in which the government was required to set forth any "defenses of which it

knew or has reasons to know," only two defenses were raised—unmistakability and possible failure of conditions precedent. Damage defenses asserted were set-off and failure to mitigate. Pl.App. Ex. 5, p. 2.

On December 22, 1997, following the decision in *California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997) in which the unmistakability defense was rejected, a rejection previously indicated in *United States v. Winstar,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), a "show cause" order was issued that required *inter alia,* the government to show cause why First Federal's Motion for Partial Summary Judgment on Liability should not be granted. In part the government's response asserted that this case, unlike the three cases in *Winstar,* involved a FSLIC Financing Agreement rather than an Assistance Agreement or Supervisory Action Agreement with integration clauses, which, according to the government, was pivotal to finding of contract in *Winstar.* The court rejects that argument.

First Federal asserts that the government's concessions are dispositive and the court's inquiry should go no further. First Federal specifically objects to the government's arguing the 1986 Financing Agreement lacked consideration, an argument already rejected herein on the merits. The government did not raise lack of consideration in its responses to First Federal's Short Form Motion for Summary Judgment. Although the CMO required the government raise any defenses of which it knew or had reason to know, it also reserved any defenses that could be raised in an Answer. Failure of consideration is one of several enumerated affirmative defenses of RCFC 8(c). As the court has rejected the government's position on contract it is not necessary to reach any

**20.** First Federal's Short Form Motion for Summary Judgment succinctly asserted: "[t]he government materially breached the Agreement when it enacted and enforced against Plaintiff the provisions of the Financial Institution Reform, Recovery, and Enforcement Act of 1989 ('FIRREA'), including mandated capital requirements higher than those set forth in Section 6.10 of the Agreement." Pl.App. Exh. 1, p. 7. While First Federal's Complaint also alleges breach by

elimination of GAAP accounting, included in the promises of Section 6.10, the motion before the court and this opinion neither addresses nor forecloses that issue.

**21.** The government requests its initial response to the short form motion for summary judgment be stricken from the record. The court declines to do.

issue as to whether lack of consideration should have been raised earlier.

The court has determined that the 1986 Financing Agreement did not lack consideration; indeed the document itself bespeaks the mutuality of its obligations. It remains to be determined whether FIRREA and its implementing regulations breached that Agreement. While the government has conceded some years ago that this legislation was "inconsistent" with its contractual obligations, the court also concludes, under the facts for which there is no material dispute, that there was a breach requiring the granting of First Federal's motion for summary judgment on liability.[22] The 1986 Financing Agreement is a contract that modified for a ten-year period, regulatory minimum capital requirements which conflicts with the specific capital requirements imposed by FIRREA's implementing regulations. The government does not contend First Federal was not in compliance with the specific capital ratios of Section 6.10 of the Financing Agreement. Although the government's response to First Federal's short form motion for summary judgment references failure of condition precedent, that argument was not further advanced and it is not before the court at this time. First Federal contends, and the court agrees and so concludes, that the government's determination that First Federal did not meet the "new" requirements and the imposition of new (and higher) capital requirements breached the specific capital requirements of Section 6.10 of the Financing Agreement.

There can be little question that the application of FIRREA and the regulations thereunder to deny or restrict plaintiffs' contractual rights to use supervisory goodwill with the associated amortization periods ... was a breach of the FSLIC's and the Bank Board's agreements with them. FIRREA greatly reduced the amount of supervisory goodwill that could be used to meet regulatory capital requirements .... The OTS by regulation treated capital credits in the same manner as supervisory goodwill ... thereby restricting the use of such credits for regulatory capital purposes.

*Winstar Corp. v. United States,* 64 F.3d 1531, 1544–45 (Fed.Cir.1995).

That the provision breached in *Winstar* was one for supervisory goodwill and the provision breached in this case is for specific capital requirements is not significant. Imposition of regulatory capital requirements contrary to those specified in the 1986 Financing Agreement was a breach.

When the law as to capital requirements changed in the present instance, the Government was unable to perform its promise and, therefore, became liable for breach. We accept the Federal Circuit's conclusion that the Government breached these contracts when, pursuant to the new regulatory capital requirements imposed by FIRREA, 12 U.S.C. § 1464(t), the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating [the thrift's] net worth.

*U.S. v. Winstar Corp.* 518 U.S. 839, 870, 116 S.Ct. 2432, 2452, 2453, 135 L.Ed.2d 964. *See also LaSalle Talman v. United States,* 317 F.3d 1363, 1370 (Fed.Cir.2003).

As the Federal Circuit noted "[t]here is nothing extraordinary about the contracts in these cases save for their subject matter and the potential liability to the government. It is well established that the government may enter into contracts with private individuals as parties .... [W]hen the government enters into such contracts, 'its rights and duties therein are governed generally by the law applicable to contracts between private individual.'" *Winstar Corp.,* 64 F.3d at 1551 (citations omitted). "Failure to perform a contractual duty when it is due is a breach of the contract." *Id.,* at 1545, citing *Restatement (Second) of Contracts* § 235(2)(1981). *See also* 3 E. Farnsworth, Contracts § 12.8, p. 185 (1990) ("The award of damages is the common form of relief for breach of contract. Virtually any breach gives the injured party a claim for damages"), cited in *Winstar IV; Restatement (Second) of Contracts* § 346,

---

22. Conversely, this conclusion also requires the denial of the government's request for summary judgment on liability contained in its Supplemental Motion for Summary Judgment and to Dismiss.

Comment a (1981) ("Every breach of contract gives the injured party a right to damages against the party in breach" unless "[t]he parties ... by agreement vary the rules").

The government concedes that FIRREA "[c]hanged [t]he [p]re-[e]xisting [c]apital [r]equirements." Def. Motion, p. 8. FIRREA gave OTS the discretion to give thrifts time to comply with its terms, and an approved Capital Plan excused the thrift from the imposition of any of the corrective or enforcement action of FIRREA so long as the plan was followed. While the government makes much of the thrift's opportunity to seek exemption from or extension of FIRREA's dictates, neither the existence of a possible exemption from FIRREA, nor First Federal's response to that "opportunity," detracts from the breach. First Federal's net worth requirements were set by contract. There was no reason why the thrift had to request further indulgence from 12 C.F.R. § 563.13 or any successor regulation.[23]

**Government's motion on liability**

The government's motion for summary judgment alleges FIRREA's consequences did not have the adverse economic impact First Federal alleges, so as a matter of law, there was no breach or at least no material breach. The government characterizes plaintiff's breach claims as three-fold: the Agreement was breached when OTS (1) forced First Federal to convert from a mutual to a stock association at a time and in a manner that was not in First Federal's best interest; (2) failed to approve a merger with Monroe Savings; and (3) forced substantial changes in First Federal's growth and business operations that caused considerable

harm. Def. Motion at 32. The government then proceeds to discount each of these "breaches." Plaintiff describes "[t]his effort to conflate damage theories with the breach is a deliberate mischaracterization of Plaintiff's position ...." Pl. Opposition at 6. First Federal argues that the breach was the government's denigration of Section 6.10 and imposition of FIRREA's higher capital requirements; the three post-FIRREA asserted consequences of that breach that are the subject of the government's motion are elements of damages.[24]

Paragraph 37 of the Complaint avers:

By reneging on its contractual promise in the Agreement to permit First Federal to operate in accordance with the capital standards set forth in Section 6.10, the United States has breached the Agreement and deprived First Federal of the value of the Agreement without just compensation or due process of law.

The rest of that paragraph itemizes damages from that breach:

First Federal has suffered damages from this deprivation and breach in that it has been forced since 1989 both to forego earnings and opportunities it could have pursued under the Agreement and to convert at a price and in a market much less favorable to it than would have been the case under the Agreement.

The court concludes the government's premises are misplaced and its arguments premature. These are matters which go to damages, and are for future determination. To the extent First Federal contends they are additional breaches or indicia of breach-

---

**23.** *See also Bank United v. United States*, 49 Fed. Cl. 1, 4 (1999), *modification denied*, 50 Fed.Cl. 327 (1999), *aff'd*, 2003 WL 22177282 (Fed.Cir. Sept.22, 2003)(unpublished):

[T]he capital forbearance operates as a modified capital requirement, which plaintiffs bargained for and which plaintiffs could not rely upon anymore.... Plaintiffs are entitled to damages that resulted from the need to meet the enhanced capital requirements that they otherwise would not have had to meet had the government honored the capital forbearance promise. This issue is not whether there was a breach, but whether, and to what extent, damages followed from it.

**24.** While not the subject of pending motions, First Federal's Complaint, Paragraph 6 alleges that the OTS (1) dictated beginning in 1989 that First Federal comply with more onerous capital requirements than those provided for in the agreement; (b) directed that in excess of $120 million in "GAAP" goodwill be disregarded: (c) refused to permit First Federal to calculate its capital compliance in accordance with GAAP as contemplated by the Agreement; and (d) demanded in 1990 that First Federal submit a capital plan effectively requiring immediate conversion to stock form, yet insisted that First Federal "repurchase" the FSLIC stock warrants pursuant to the Agreement.

es, factual issues preclude summary adjudication of liability. The court will, however, address the government's arguments and First Federal's response in turn.

**Monroe merger attempt**

As further evidence of the breach (or perhaps damages, depending on characterization), on December 23, 1988, prior to the passage of FIRREA, First Federal sought government approval to merge with Monroe Savings Bank ("Monroe"), another financially troubled thrift. First Federal projected $27 million in additional earnings over a five year period from this acquisition. Following a bidding process, FDIC determined that First Federal's acquisition of Monroe was the better of two proposals and agreed to contribute $33 million in cash assistance. In a November 22, 1988 memorandum, the Federal Home Loan Bank of New York ("FHLB–NY") concluded that First Federal would still meet the minimum capital requirements of Section 6.10 following the merger.

> [First Federal] is operating under a Finance Agreement dated August 8, 1986 with the FSLIC whereby the association is required to maintain the following capital to liabilities ratios:
>
> | Years 1986 to 1991 | 1.09% |
> | Years 1992 to 1993 | 1.41% |
> | Years 1994 to 1996 | 3.56% |
>
> Although the merger will immediately reduce [First Federal's] capital ratio to 1.84%, the association should not have any problem meeting the Financing Agreement minimum capital requirement.

Def.App., Ex. 22, p. 4. Mr. Vigna concurred in the memorandum's recommendation to accept First Federal's bid. Pl.App., Ex. 12, pp. 197–98. A February 14, 1989 FHLB–NY memorandum to Vigna again recommended acceptance of First Federal's proposal to acquire Monroe and again concluded that the minimum capital requirements of Section 6.10 would be maintained. Def.App. Ex. 20, p. 5. The FHLBB District staff recommended approval of the application subsequent to FIRREA's passage. Pl. Statement of Undisputed Facts, No. 27 and Def. Response; Def.App. Ex. 27. The application for approval of the Monroe merger had been pending for a long period of time due to

formal challenges filed by Columbia Savings Bank, a competitor of First Federal. FDIC requested First Federal either obtain the required OTS approval or advise OTS that it would not be proceeding. First Federal was advised that approval was not likely. FDIC asked that First Federal withdraw its application so that alternate arrangements for Monroe Savings could be pursued. On November 14, 1989, First Federal withdrew its application. Def. Statement of Undisputed Facts, No. 30 and Pl. Response.

The government contends that Section 6.10 on its face merely states that the net worth requirements of 12 C.F.R. § 563.13(1986) "shall not be required of First Federal." It does not, however, govern should First Federal subsequently apply for an assisted acquisition or merger. The lower capital requirements of Section 6.10 should not extend to a larger merged institution. According to the government, Section 6.10 does not explicitly extend to such acquisitions; therefore any extension would have to be an implicit term or "indispensable" to the performance of the express contract, which is it not. Regulatory scrutiny of mergers was not eliminated by Section 6.10 the government avers. 12 C.F.R. § 563.13 from which First Federal was exempted, was not the sole standard by which mergers were to be judged either at the time of the 1986 Financing Agreement or in 1989 when the merger application was reviewed. Specifically, Section 6.09 of the Agreement provided that First Federal would remain subject to all regulatory restrictions "except as set forth in section 6.10." Def.App. Ex. 11, p. 56. 12 C.F.R. § 563.22 contains criteria for evaluating merger applications which was not superceded by Section 6.10.

From the outset First Federal states that OTS' failure to approve its application for an assisted merger with Monroe Savings is part of its consequential damages and not ripe for adjudication. Alternatively, however, whether an element or evidence of breach or damages, First Federal contends that, as combined, the merged institution's capital levels were within the minimum required under Section 6.10; and the application was thwarted when, although FDIC had approved and

agreed to provide cash assistance, OTS did not approve, solely because of First Federal's failure to meet FIRREA's capital requirements. First Federal also points out that the 1986 Financing Agreement specifies that it is binding on successors and assigns, which encompasses merger targets.[25]

As authority for extension of its preferential capital levels to Monroe, a target of an assisted merger, First Federal cites *Far West Federal Bank v. Office of Thrift Supervision–Director*, 119 F.3d 1358 (9th Cir. 1997). *Far West* is not, however, dispositive on this issue. In *Far West*, a Conversion Agreement specifically provided that Far West would be deemed in compliance with regulatory capital requirements " 'for all purposes under the Insurance Regulations then in effect.' " 119 F.3d at 1364. The government argued the provision did not extend to calculation of Far West's "Loan to One Borrower" ("LTOB") limit. The Ninth Circuit rejected that argument, reasoning that pre-FIRREA regulations calculated LTOB limit as a percentage of regulatory capital. In other words, LTOB was a factor of and depended on the amount of regulatory capital. "Thus, by promising to define regulatory capital to include intangible assets 'for all purposes' under the regulations, the government also promised that Far West's LTOB limit would reflect those intangible assets." 119 F.3d at 1365. Two distinctions are apparent. First, the "for all purposes" qualifier is not in Section 6.10 of the 1986 Financing Agreement. Secondly, while LTOB and regulatory capital in *Far West* were in direct numerical relationship, an application for a merger with a $33 million cash infusion by FDIC was governed by more than a mathematical calculation.

Furthermore, First Federal's reliance on *Winstar*, 518 U.S. 839, 921, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996)(J. Scalia concurring) is not dispositive on this issue. First Federal cites from that opinion that "[T]he promise to accord favorable regulatory treatment must be understood as (unsurprisingly) a *promise* to accord favorable regulatory treatment." Pl. Opposition at 29. Here the issue is whether Section 6.10 ratios apply to the acquisition of another troubled thrift. Do the same ratios apply to a larger institution? Does it matter that while the ratios may be the same, as applied to a larger institution, the resulting capital deficiency would be greater? These and other questions await further proceedings.[26]

The court agrees with First Federal that the failure to approve the Monroe merger is part of the damages phase of this case and is not ripe. Alternatively, the court finds that there are genuine factual issues as to whether the failure to approve the Monroe merger application breached the 1986 Financing Agreement. Mr. Vigna, the principal supervisory agent testified that problems with tangible capital was one of the reasons the application was not approved, along with the issue of fees that had to be factored into the transaction. Pl.App. Ex. 12 at 209–211. On September 14, 1989, OTS conveyed to Danny Wall its recommendation against the merger because it would increase First Federal's negative tangible capital. Def.App. Ex. 80. Several day later, on September 22, 1989, a memorandum of a conference call reflects FDIC's opinion that, although the acquisition would result in a reduction in First Federal's capital ratios, "it is our believe (sic) from review of the data submitted that the result-

---

**25.** Section 8.01 of the 1986 Financing Agreement provides that no "Amendment, modification, or waiver of any provision of [the] Agreement ..." would be effective unless embodied in a written agreement. Section 8.06 requires FSLIC's prior written consent to any assignment or transfer of any of First Federal's rights or privileges:

Section 8.06. *Benefit and Assignment.* This Agreement shall be binding upon and shall inure to the benefit of First Federal and FSLIC and, except as otherwise provided in this Agreement, their respective successors and assigns, provided that, except as otherwise expressly provided in this Agreement, First Fed-

eral may not assign or transfer any of its rights, privileges, or powers or delegate any of its duties or obligations under this Agreement without the prior written consent of FSLIC. Def. Ex. 11, p. 60–61.

**26.** Likewise, Dr. Unal's opinion, offered by the government, that elementary principles of corporate economics counsel that the government, the only economic stakeholder at the time of the alleged breach and the only party with capital at risk, should not be liable for damages related to First Federal's inability to acquire Monroe Savings, relates to damages, not liability.

ing bank would be far stronger. Furthermore, [First Federal's] ability to sell stock will be enhanced by the transaction." Def. App. Ex. 79, p. 1. OTS was not impressed according to the memorandum, and raised issues relating to entrance and exit fees:

> ... while they did not refute our conclusions they interjected a number of new obstacles namely entrance and exit fees and the fact that as of January 1990 the subject merger, as proposed could not be approved [because of FIRREA] ... and questioned if the merger would be as financially beneficial if fees were factored into the transaction.
>
> They also interjected the deposit structure of Monroe (Brokered Funds CD's etc.) but when we tried to answer (No brokered funds and approximately 90% core deposits) they went on to another area ....
>
> ...
>
> We will get info on fees ... and get back to Washington. However I believe deal is dead.

Def.App. Ex. 79, pp. 1–2.

Given the procedural posture of this case, the possible intertwining of breach and damages, factual issues concerning the reasons OTS did not approve the merger, ambiguities in the Agreement that implicate the parties' intention, and legal questions concerning merger standards, the government's motion for summary judgment on liability on this ground is denied. The court is not ruling that the failure to approve the merger was not a breach of the 1986 Financing Agreement, nor that First Federal is not entitled to advance damage theories based on this non-merger. The court concludes only that the government's motion for summary judgment that the failure to approve the application to merge with Monroe did not violate the 1986 Financing Agreement should be denied.

### Conversion to stock association

First Federal asserts that, as another consequences of the government's breach, it was forced to convert to a stock association at an economically inopportune time, and in a modified rather than a standard public stock offering, resulting in a lower price per share that could have been realized in a standard conversion with a public stock offering. The government argues the 1986 Financing Agreement did not grant First Federal unlimited discretion in determining either the timing or type of conversion.

### Timing of conversion

There are material factual issues as to when First Federal was required to convert from a mutual association to a stock association. As First Federal concedes, while it did not have unfettered discretion to decide when to convert, it did have substantial latitude. The 1986 Financing Agreement defines the term "Common Stock Offering" as "the offering of Common Stock (and possibly Convertible Securities and/or Public Warrants) which will be made by First Federal **when and if** the Conversion occurs." [27] Def.App. Ex. 11, p. 7, emphasis supplied. In Section 6.04, First Federal covenants to use its "best efforts" to convert if the Board of Directors determines the timing is right:

> Section 6.04 *Conversion Covenant.* First Federal shall use it **best efforts** in good faith to complete the Common Stock Offering and to consummate the Conversion **as soon as practicable,** provided that the Board of Directors shall have **reasonably determined** that it is in the best interests of First Federal to proceed with the Conversion.

Def.App. Ex. 11 at 88 of 102, emphasis supplied.

First Federal's 1986 Capital Plan [28] also recognized flexibility in timing of the conversion to stock form:

> The optimum combination of the above factors **could result in completing the process of conversion,** registration, valuation, underwriting, approval of members and community and public offerings **within 18 months** from the date of recapitaliza-

---

27. The FHLBB resolution approving the 1986 Financing Agreement, recited that First Federal would "ultimately" convert to stock form. Def. App. Ex. 12, p. W0F020 2062.

28. So there is no confusion, a Capital Plan was attached as an exhibit to the 1986 Financing Agreement and should not be confused with the Capital Plan later submitted post-FIRREA.

tion. However, if more than a one year track record is required or the value of the offering would be significantly raised through different market timing, the process will be adjusted accordingly. Based upon these conditions, the Association's Capital Plan will be implemented with the **goal** of completing the entire conversion and stock issuance process within an 18–36 month period from recapitalization.

Def.App. Ex. 11, Attachment E, p. R0070124, emphasis added.

"In the event that market conditions prevent a successful public offering within the planned 18 to 36 month period, [First Federal] will continue to build a growing earnings record and will stand ready to immediately complete the offering process as soon as market conditions permit." *Id.,* p. FR0070125.

The government also asserts that the conversion and stock sale was determined by First Federal's Board of Directors to be in its best interests and that a fair value was received. First Federal submits deposition excerpts of First Federal's officers and directors that the breach compelled First Federal to convert, and that, but for the breach, they would not have considered it to be in the best interest of First Federal to do so because the conversion was undertaken when the market for raising capital was terrible, and caused First Federal to lose the benefits of $135 million in tax loss carry-forwards. Accordingly, even if the issue of damages from First Federal's timing and type of stock conversion was ripe, there are genuine factual issues that preclude the government's motion for summary judgment that the conversion was not a breach of contract or a consequence thereof.

Related to the lower price per share consequence contained in First Federal's Complaint, the government raises another objection. If not rushed, First Federal asserts it would have been able to get more for its stock. According to the government, the

logical extension of that argument is that CT, which purchased the stock prematurely (and at a lower price), would have had to pay more for the stock. As an assignee of the proceeds of any recovery in this action, it would be absurd to allow CT's affiliate to recover an increase in price it didn't have to pay. First Federal is entitled to present this damage claim and the government is entitled to contest the same. Any judgment would be in favor of First Federal. The fact that FIRREA, Inc. or any other entity has a contract right to any proceeds is a matter between private parties and does not impact First Federal's right to seek damages. Moreover, although there appears to be no relevant claim of offset, any such defense or argument in mitigation can be advanced at the damage phase of this proceeding.[29]

**Type of merger**

First Federal also contends that the conversion contemplated by Section 6.04 was a standard conversion, offering of stock first to its depositors and then to the public. Because of the economic coercion of FIRREA, First Federal was forced to a modified conversion, essentially a private stock sale, resulting in a lower price per share. The government argues that because First Federal's undertaking was not limited to a standard conversion, a modified stock conversion was not in breach of the 1986 Financing Agreement.

Regulations governing conversions from mutual to stock form provide for the three types of conversion. *See* 12 C.F.R. § 563b (1986) Subpart A—Standard Conversion; Subpart C—Voluntary Supervisory Stock Conversions and Subpart D—Guidelines for Modified Conversions. The 1986 Financing Agreement is not specific. Section 1.01.14 of the Agreement defines "conversion" as "the conversion of First Federal from a federal mutual savings and loan association to a federal stock savings and loan association." Def.App. Ex. 11, p. 7. Section 6.07 contains covenants that require First Federal to maintain stock registration under the Securi-

---

29. Because of the court's findings herein, the government's argument that neither the successors-in-interest to the First Federal that signed the 1986 Financing Agreement nor First Federal's assignees of any proceeds of this action are third party beneficiaries of that Agreement is not addressed.

ties Exchange Act of 1934, take no action that would cause termination of the public trading of such stock, and not engage in any Rule 13e–3 transactions under the Exchange Act, so long as FSLIC held stock warrants— covenants that suggest public offering was contemplated. Evidence submitted by the parties on this issue is conflicting. First Federal's "goal" was to undergo a standard conversion. Pl.App. Ex. 9, p. 6. This "goal," however, was viewed as impracticable by the FHLBB and it was "highly unlikely that the Association will be able to successfully complete a standard conversion . . . ." *Id.*, p. 5.

The court concludes there is ambiguity on both the question of the timing and the type(s) of conversion. Given three types of stock conversion, the fact that the 1986 Financing Agreement is not specific on the type of conversion required, and the existence of conflicting evidence on which type (if any) was contemplated by the parties, raises ambiguities. The discretion and "best efforts" standards on timing of any conversion are also open to various interpretation. Applicable provisions in the 1986 Financing Agreement could reasonably be interpreted several ways precluding summary adjudication. *See Beta Systems, Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir. 1988)("[t]o the extent that the contract terms are ambiguous, requiring weighing of external evidence, the matter is not amenable to summary resolution"). Summary adjudication is not appropriate at this juncture because genuine factual issues remain both as to both the timing and type of conversion. Secondly, the issue of type and timing of the conversion are elements of damages, matters that are not ripe. Accordingly, the government's motion for summary judgment on these issues is denied.

### No adverse economic effect on First Federal.

The government also moves for a summary adjudication that the 1990 Capital Plan submitted by First Federal post-FIRREA had no adverse economic impact on First Federal. First Federal asserts it was the requirement that First Federal comply with the new capital requirements of FIRREA in lieu of Section 6.10 that was the breach that caused

economic harm, not the 1990 Capital Plan. Whether or not First Federal was adversely effected by the breach is a matter of damages to be resolved in later proceedings.

### Restitution

Initially, the government sought to dismiss what it characterized as First Federal's cause of action for restitution. In response, First Federal explained it was claiming restitution as a remedy, not as a substantive cause of action. With that understanding, the government withdrew its motion to dismiss on that ground. Def. Reply, p. 27. To the extent that the government argues restitution is not an appropriate remedy, that is an issue of damages and is premature.

### Motion to Dismiss plaintiff's takings and due process claims

The government's Motion to Dismiss also seeks dismissal of First Federal's takings claims asserted in Count V of the Complaint. First Federal points out that consideration of takings claims is premature based on Senior Judge Smith's order of November 2, 2000 applicable to all *Winstar* cases which granted an indefinite stay of any obligation to respond to dispositive motions regarding constitutional claims, including takings and due process claims. The court hereby lifts any remaining stay. However, in considering whether or not to pursue that claim or voluntarily dismiss it, First Federal should be mindful of the Federal Circuit's decision in *Castle v. United States*, 301 F.3d 1328 (Fed. Cir.2002), *cert. denied*, —— U.S. ——, 123 S.Ct. 2572, 156 L.Ed.2d 602 (2003) which appears to be dispositive of plaintiff's takings claims. In *Castle*, the Federal Circuit held that the enactment of FIRREA did not constitute an unconstitutional taking because the plaintiffs "retained the full range of remedies associated with any contractual property right they possessed." *Id.*, at 1342. *See also Bailey v. United States*, 341 F.3d 1342, 1346– 47 (Fed.Cir.2003). On several recent occasions since *Castle*, this court has dismissed *Winstar*-related takings claims. *See AG Route Seven Partnership v. United States*, 57 Fed.Cl. 521, 535 (2003)("case law is clear that Fifth Amendment taking claims are inapposite with contract claims when the government is a mere party to a contract and

not acting as a sovereign ..."); *First Federal Sav. Bank of Hegewisch v. United States,* 57 Fed.Cl. 316, 318–19 (2003)(finding *Castle* to be dispositive and dismissing plaintiff's takings claim); *National Australia Bank v. United States,* 55 Fed.Cl. 782, 789 (2003)(a takings claim is "conceptually foreclosed" by the finding of a breach of contract); *Granite Mgmt. Corp. v. United States,* 55 Fed.Cl. 164, 167 (2003)(holding that the plaintiff's "cause of action therefore is in contract, not takings law" and dismissing takings claim following an order to show cause). *See also, Detroit Edison Co. v. United States,* 56 Fed. Cl. 299, 303 (2003)(noting it is inappropriate to permit a plaintiff "to pursue a takings remedy in order to circumvent the limitations inherent in its contractual relationship with the Government").

As for First Federal's claims based on due process considerations, the Federal Circuit has "established that there is no jurisdiction under the Tucker Act over a Due Process claim unless it constitutes an illegal exaction." *Casa De Cambio Comdiv S.A., De C.V. v. United States,* 291 F.3d 1356, 1363 (Fed.Cir.2002) *cert. denied,* 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003) (citations omitted); *Crocker v. United States,* 125 F.3d 1475, 1476 (Fed.Cir.1997)("The Court of Federal Claims correctly concluded that it does not have jurisdiction to hear Crocker's due process or seizure claims under the Fifth Amendment to the United States Constitution") (citations omitted). *See also AG Seven Partnership v. United States,* 57 Fed.Cl. 521, 534–35 (2003)(court lacked jurisdiction over plaintiffs' due process claims); *National Australia Bank v. United States,* 55 Fed.Cl. 782, 789 (2003) (dismissing due process claims for lack of jurisdiction).

**Conclusion**

For the foregoing reasons:

(1) First Federal's "Short Form" Motion for Partial Summary Judgment on liability filed February 28, 1997, is **GRANTED.** The government's Motion for Summary Judgment and to Dismiss filed October 10, 2000, is **DENIED.**

(2) Any stay of the obligation to respond to motions for summary judgment and/or motions to dismiss regarding takings and due process claims is hereby **LIFTED.** First Federal shall respond to the government's Motion for Summary Judgment and to Dismiss First Federal's claims for a taking of either contract or property rights and for violations of due process. Any response shall be filed on or before **November 14, 2003.** The government may file a reply on or before **December 1, 2003.**

(3) The parties are directed to consult, propose, and file on or before **November 14, 2003,** a status report (joint, if possible) as to their views on future proceedings regarding damages in this case.